
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
**March 29, 2024**
Nathan Ochsner, Clerk of Court

| | |
|---|---|
| JOHN PAUL BUSTAMANTE, STEVEN PAUL, MICHAEL WHITTEN, JOHN MOORE, AND CHRISTOPHER TAWIL<br>*Intervenors*<br><br>v.<br><br>WEALTH ASSISTANTS LLC<br>*Plaintiff*,<br><br>v.<br><br>THREAD BANK<br>*Defendant*. | Civil Action No. 4:24-CV-00040 |

**COMPLAINT IN INTERVENTION BY JOHN PAUL BUSTAMANTE, STEVEN PAUL, MICHAEL WHITTEN, JOHN MOORE, AND CHRISTOPHER TAWIL**

Intervenors—John Paul Bustamante, Steven Paul, Michael Whitten, John Moore, and Christopher Tawil—by and through their undersigned attorney, hereby bring this Complaint in Intervention against Wealth Assistants LLC ("Wealth Assistants") and allege as follows:

## SUMMARY OF CASE

1. Wealth Assistants defrauded Intervenors and hundreds of other individuals out of millions of dollars. Specifically, Wealth Assistants advertised that it would provide its clients with substantial income by setting up and managing lucrative online Amazon stores that the clients would own. But Wealth Assistants did not provide the promised services. Instead, it used the fees it collected from Intervenors and its other clients for the benefit of its principals.

2. Wealth Assistants' clients would pay it an upfront fee of up to $125,000 to set up and manage an online Amazon store in the client's name. After that, the client would pay for the store's inventory, along with certain other smaller fees. In return, the individual would be entitled to collect between 50 percent and 70 percent of the online store's gross profits.

3. Wealth Assistants advertised that the profits of an online store it managed should grow to more than $10,000 per month by the end of the store's first year.

4. Hundreds of individuals, including Intervenors, purchased the business opportunity Wealth Assistants offered. Most of these purchasers were middle class, and many had to use all their retirement savings or take out home equity loans to make the purchase.

5. Wealth Assistants never intended to follow through on its promises.

6. Some of Wealth Assistants' clients never even received an online store after paying the fee. Others received stores (which themselves are valueless and can be easily and freely set up), but their stores were never stocked with any inventory. Others paid Wealth Assistants for inventory after receiving inventory invoices from Wealth Assistants that turned out to be fake; the inventory never actually appeared in their stores.

7. Ultimately, the vast majority of Wealth Assistants' clients have received less than $10,000 in profits from their online stores, and many never received a single dollar of revenue from their stores (if they received stores at all).

## JURISDICTION AND VENUE

8. Intervenors' claims arise under the laws of Texas. This Court has original diversity jurisdiction, pursuant to 28 U.S.C. § 1332, because the action involves a controversy between citizens of different states and the amount in controversy exceeds $75,000.00 USD, exclusive of interest and costs.

9. Wealth Assistants is a limited liability corporation now known as "Yax Ecommerce LLC." Upon information and belief, its sole member is Ryan Carroll, who is a resident of Florida.

10. Thread Bank is a limited liability corporation. Upon information and belief, its sole member is Christopher J. Black, who is a resident of Tennessee.

11. John Paul Bustamante is a resident of California and has suffered ascertainable damages greater than $75,000 as a direct result of Wealth Assistants' fraud.

12. Steven Paul is a resident of New Hampshire and has suffered ascertainable damages greater than $75,000 as a direct result of Wealth Assistants' fraud.

13. Michael Whitten is a resident of Alabama and has suffered ascertainable damages greater than $75,000 as a direct result of Wealth Assistants' fraud.

14. John Moore is a resident of Maryland and has suffered ascertainable damages greater than $75,000 as a direct result of Wealth Assistants' fraud.

15. Christopher Tawil is a resident of California and has suffered ascertainable damages greater than $75,000 as a direct result of Wealth Assistants' fraud.

16. Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this District and because Wealth Assistants is subject to the Court's personal jurisdiction with respect to this action.

## FACTS

### A. Wealth Assistants Purported To Sell Online Store Management Services

17. The following is a summary of Wealth Assistants' agreements with its clients, including Intervenors:

a. Wealth Assistants' clients would pay it to set up an online store on the Amazon platform that the clients would own. These stores offered goods for shoppers to purchase online.

b. Wealth Assistants' clients would pay for the online store's inventory.

c. Wealth Assistants' clients were required to pay certain other fees, such as annual fees and a "success fee" when the store was successfully set up.

d. Wealth Assistants would manage the store, including by providing customer service, maintaining relationships with suppliers, and managing the inventory.

e. Wealth Assistants' clients would keep between 50 percent and 70 percent of the gross profits generated by the stores, and Wealth Assistants would take the remaining profits for itself as a management fee.

18. Until December of 2022 or January of 2023, most or all of Wealth Assistants' clients signed a standardized contract containing the terms described below.

19. The contracts referenced in the paragraph above contained numerous statements that Wealth Assistants knew were false. For example, the contracts stated:

> The Client will own a turnkey automated drop shipping Amazon retail store, which will be built and operated by the Service Provider. Product research, supplier negotiations, supplier relationships, product listing, day-to-day price updates, quality control, processing returns, customer service, financial reporting, and business growth in the direction of $10,000+ net profit monthly (assuming Client has the necessary resources, cash/credit) are among the services provided.

20. The contracts also stated "In months 12 – 60+, the goal will be to net the Client upwards of multiple 6-figures per year ($350-$600K+ per year) if Client remains with the Service Provider and this Contract is not terminated for any such reason."

21. Wealth Assistants knew that nobody planned to provide Wealth Assistants' clients with the full set of services Wealth Assistants was promising in those contracts. For example, Wealth Assistants knew that it did not have a goal of generating $10,000 of monthly profit in

Intervenors' stores. Wealth Assistants knew that it instead intended to neglect Intervenors' stores so that the stores would generate little or no profits.

22. The contracts also contained the following "Buyback" clause:

> If Client has substantially complied with all the provisions of this Service Agreement, and after the Client's 1st anniversary of getting their first Amazon sale, they have not made back their initial $55,000 (fifty-five thousand dollars) investment from net profit on their business, the Service Provider will offer them a buy-back of their Amazon retail store or waive their two thousand five hundred dollars ($2,500) annual store renewal fee if they have not yet paid it or credit them their annual renewal fee in full if they have already paid it.

23. Wealth Assistants knew that it never intended to honor its Buyback clause.

24. In December of 2022, or January of 2023, Wealth Assistants began using different standardized contracts for its new clients. The later standard contracts stated that "The Service Provider's principal aims are to provide a 'done for you' operation for Client, focusing on high-quality lawfully commercialized products offered at competitive prices accompanied by excellent customer service for end-user customers in a manner that promotes growth."

25. The following "description of services" appeared in the contracts referenced in the paragraph above:

> A. Initial Phase. Initially, Service Provider will manage the process of transferring the Store to Client (the "Migration"). Migration includes but is not limited to: finalizing the Transfer (described at Exhibit D), changing account names, email address, bank account information, payment information, and other steps required by the Host. Migration generally takes 1 to 2 weeks but may be substantially delayed if issues arise. Migration completes upon delivery of new account credentials and the training manual.
>
> B. Ramp-Up. During the remainder of the first year, Service Provider will steadily encourage and support ramping up the scale of the Store by, for example, increasing product listings, optimizing SEO, and exploring advertising opportunities. Increased inventory will be required to meet increased demand as described below. The focus of this period is to lay the groundwork for future success.

| MONTHS | COST OF INVENTORY PER MONTH |
|---|---|
| 1 | $15,000 |
| 2 - 3 | $30,000 |
| 4 - 6 | $50,000 |
| 7 - 12 | $70,000 |
| 13 – 18 * | $90,000 |
| * The end of this period is the "**Milestone**." | |

26. Wealth Assistants knew that it would not be able to "ramp up" stores at the rate it promised in its contracts.

27. Likewise, the following description of Wealth Assistants' "Management" services appeared in the same contracts:

> B. <u>Management.</u> Service Provider will serve as a business consultant for the Store; performing for example:
> ● Product research and analysis of market data to identify top-selling products,
> ● Supplier relationships,
> ● Strategic sourcing or bulk-ordering products from optimal suppliers,
> ● Planning warehousing and fulfillment options,
> ● Product listings including, pricing decisions, and pricing updates,
> ● Deployment of Store look and feel (including Store name which may change from time to time),
> ● Customer service including quality control, and processing returns, and
> ● Internal financial reporting.
> Service Provider shall make commercially reasonable efforts to maintain the uniqueness of the Store. In the event Client discovers certain inventory overlap with other stores, Client agrees to notify Service Provider.

28. Wealth Assistants knew that it would not provide the "Management" services described in that portion of the contracts.

29. The same contracts also promised Intervenors a purported "Buyback Warranty," which stated, in part, as follows:

> In the event Profit does not exceed the Threshold by the Milestone, Client may elect to receive from Service Provider: (1) a Credit, or (2) the Buyback Amount.

**"Profit"** means Gross Income less the Success Fee received by the Milestone.
**"Threshold"** means the Set-Up Fee.
**"Credit"** means an amount equivalent to the Annual Fee, and redeemable, at Client's option, by refund if already paid, or by application to Client's account.
**"Buyback Amount"** means an amount equivalent to the Threshold less the Profit.

30. Wealth Assistants knew that it never intended to honor the terms of its Buyback Warranty, and Wealth Assistants in fact did not honor the terms of its Buyback Warranties with Intervenors.

### B. Wealth Assistants' Marketing

31. Wealth Assistants sent most or all of its prospective clients projections showing that the stores Wealth Assistants managed would generate more than $10,000 per month. An example of such a slide is shown below:

**OUR AMAZON MANAGEMENT PROJECTIONS**

| MONTH | HYPOTHETICAL GROSS SALES | HYPOTHETICAL PROFIT TOTALS | HYPOTHETICAL MARGINS |
|---|---|---|---|
| 1 to 3 | up to $20,000 | up to $4,000 | 15-20% |
| 3 to 6 | $20,000 to $35,000 | $3,000 to $7,000 | 15-20% |
| 6 to 9 | $35,000 to $50,000 | $5,000 to $10,000 | 15-20% |
| 9 to 12 | $50,000 to $80,000 | $7,500 to $16,000 | 15-20% |
| **First year totals** | **$315,000 to $525,000** | **$49,500 to $105,000** | **15-20%** |
| 12 to 16 | $80,000 to $110,000 | $12,000 to $22,000 | 15-20% |
| 16 to 20 | $110,000 to $135,000 | $16,500 to $27,000 | 15-20% |
| 20 to 24+ | $135,000 to $185,000+ | $20,250 to $37,000+ | 15-20% |

These images and sales summary are not actual and are used for example purposes only. Wealth Assistants is in no way affiliated, associated, authorized, or endorsed by, or any way officially connected with Amazon INC. No client's success, earnings, or production results should be viewed as typical, average, or expected. Not all clients achieve the same of similar results, due to many factors including, but not limited to, the amount of inventory purchased per month to be sold on your store, margin of products sold, and your results may be higher or lower than those stated in our clients testimonials. This is why we offer a conditional buy back clause described in our service agreements to those that decide to partner with us.

*Please note these numbers are before our profit splits

32. Very few, if any, of Wealth Assistants' investors ever achieved the "monthly profit totals" advertised by Wealth Assistants.

33. Wealth Assistants knew that its clients could not reasonably expect to achieve more than $10,000 per month in profits.

34. The slide deck also included the following slide:



35. Wealth Assistants knew that it did not intend to honor the "Buy Back" guarantee advertised in the slide above.

36. Wealth Assistants also lured clients with false advertising on social media. For example, on March 28, 2023, Wealth Assistants posted on its Facebook account that "you'll have the opportunity to sell your business 2-3 years from opening up your Amazon store (once your sales are $100K+/monthly)."

### C. Intervenors' Experiences With Wealth Assistants

37. All Intervenors received from Wealth Assistants representations stating that they could expect to earn more than $10,000 per month by purchasing the business opportunity Wealth Assistants was offering.

38. Relying on those representations, all Intervenors spent at least $30,000 to purchase the business opportunity Wealth Assistants offered.

39. Yet, not one Intervenor has received $10,000 in revenue over the *lifetime* of their store.

40. On June 29, 2023, Wealth Assistants' representative Peter McLean sent Intervenor **John Paul Bustamante** projections indicating that if Bustamante purchased the business opportunity Wealth Assistants was offering, he would receive more than $10,000 per month in profits by the end of the store's first year. Bustamante relied on those projections when purchasing the business opportunity Wealth Assistants offered.

41. Intervenor Bustamante never even received the store that Wealth Assistants promised to set up and manage for him.

42. On June 7, 2022, Wealth Assistants' representative Mack McKaughan told Intervenor **Steven Paul** that if he purchased the business opportunity Wealth Assistants was offering, he would receive more than $10,000 per month in profits by the end of the store's first year. Paul relied on those projections when purchasing the business opportunity Wealth Assistants offered.

43. Intervenor Paul has received less than $3,000 in revenue in connection with that store.

44. In or around September of 2023, Wealth Assistants' representative Jared Day told Intervenor **Michael Whitten** that if he purchased the business opportunity Wealth Assistants was offering, he would receive more than $10,000 per month in profits by the end of the store's first year. Whitten relied on those projections when purchasing the business opportunity Wealth Assistants offered.

45. Intervenor Whitten never even received the store that Wealth Assistants promised to set up and manage for him.

46. In or around July of 2022, Wealth Assistants' representative Charles Butler told Intervenor **John Moore** that if he purchased the business opportunity Wealth Assistants was offering, he would receive more than $10,000 per month in profits by the end of the store's first year. Moore relied on those projections when purchasing the business opportunity Wealth Assistants offered.

47. Intervenor Moore received less than $1,000 in revenue from the store over the store's lifetime.

48. On June 2, 2022, Wealth Assistants' representative Luigi Caceres told Intervenor **Chris Tawil** that if he purchased the business opportunity Wealth Assistants was offering, he would receive more than $10,000 per month in profits by the end of the store's first year. Tawil relied on those projections when purchasing the business opportunity Wealth Assistants offered.

49. Intervenor Tawil has received less than $3,000 in revenue in connection with that store.

## CAUSE OF ACTION FOR FRAUD BY ALL INTERVENORS AGAINST WEALTH ASSISTANTS LLC

50. Intervenors incorporate by reference all allegations above.

51. "To prevail on a fraud claim, an intervenor must demonstrate four elements: (1) a material misrepresentation; (2) made with knowledge of its falsity or made recklessly without knowledge of the truth; (3) made with the intent that the other party should act; and (4) that the other party acts in reliance on the misrepresentation and suffers injury." *Lyda Constructors, Inc. v. Butler Manufacturing Co.*, 103 S.W.3d 632, 638 (Tex. App. 2003). Wealth Assistants made misrepresentations to Intervenors to entice them to purchase its services.

52. Wealth Assistants knew of the falsity of the misrepresentations to Intervenors.

53. Intervenors relied on those misrepresentations when purchasing services or goods from Wealth Assistants.

54. Intervenors suffered damages as a result.

## PRAYER FOR RELIEF

**WHEREFORE**, Intervenors respectfully request that the Court:

A. Award compensatory, consequential, exemplary, and punitive damages to Intervenors in the amount of $1,000,000;

B. Award attorneys' fees and costs to Intervenors in an amount to be determined at trial;

C. Grant to Intervenors whatever other relief is just and proper.

**Jury Trial Demanded**

DATED: February 9, 2024

      /s/Joushua Stein
Joshua Stein*
Texas Bar: 24079392
US District Court S.D. Texas: 3467353
PO Box 890022
Houston, Texas 77289
(713) 702-4585
Josh.Stein.Esq@gmail.com
Nico Banks**
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002
*Attorney in charge
**Admitted *pro hac vice*
*Attorneys for Intervenors*

**CERTIFICATE OF SERVICE**

      I hereby certify that on February 9, 2024, a true and correct copy of the foregoing document was transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record. On the same day, I also mailed a copy of the foregoing document to Thread Bank at their address of 210 East Main Street, Rogersville, TN 37857.

/s/Nico Banks
Nico Banks, Esq. *
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002
*Attorney for Intervenors*
*Admitted *pro hac vice* and signed with permission of attorney in charge